UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                                              3:04-cr-206-J-20MCR

DAVID GOODMAN

_____

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant David Goodman's ("Goodman")
motion entitled "Motion to Suppress Items Seized During Unlawful Search of David
Goodman's Private Studio." (Doc. No. 446). Goodman, co-owner of a production
studio located at 9037 Lem Turner Boulevard, Jacksonville, Florida, seeks to suppress
evidence obtained as the result of a search of the studio. Generally, Goodman
maintains the search and subsequent seizure of evidence in this case were conducted
in violation of his Fourth Amendment rights. As this matter was referred for a report
and recommendation, the undersigned conducted an evidentiary hearing on July 12,
2005.

I.     **Report**

       A.     **Factual Summary**

       As part of an ongoing narcotics investigation, Detective Charles Bates
("Detective Bates") of the Jacksonville Sheriff's Office sought and received authorization

---

[1] Any party may file and serve objections hereto within TEN (10) DAYS after service of this opinion.
Failure to do so shall bar the party from a de novo determination by a district judge of an issue covered herein
and from attacking factual findings on appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a) and (e);
Local Rule 4.20, United States District Court for the Middle District of Florida.

from the Circuit Court of the Fourth Judicial Circuit, in and for Duval County, Florida  to

intercept wire communications of two cellular telephones used by Co-Defendant Jamal

Shakir ("Shakir").  See Government's Exhibits 8A-11C.  Pursuant to the authorization,

Detective Bates intercepted approximately 43 calls, including several alleged drug-

related conversations between Shakir and Goodman.  See Government's Exhibit 4A.

As a result, Detective Bates subsequently applied for and obtained a state-issued

warrant for Goodman's arrest on July 6, 2004.  Id.

Receiving information from a cooperating source regarding Goodman's

whereabouts, as well as independent information as to where Goodman was employed,

Detective Bates and Officer Donald Nixon ("Officer Nixon"), along with two other JSO

officers, traveled to the studio to execute the arrest warrant.  Upon arrival, the officers

observed an unidentified male standing in front of the studio utilizing a cellular

telephone.  Recognizing the vehicles and occupants therein as law enforcement, the

unidentified male immediately ran inside the studio.  Upon entering the studio, the

officers encountered approximately 10 to 12  individuals in the immediate lobby area.

After securing the lobby area, the officers conducted a protective sweep of the entire

premises.

Officer Nixon proceeded through a hallway adjacent to the studio entrance where

he discovered an overhead attic door with an attached pull-down rope.  Officer Nixon

then opened the attic door and proceeded up the retractable staircase whereupon he

discovered what he believed to be cocaine, wrapped in opaque packaging.  Having

-2-

informed Detective Bates of his discovery, Detective Bates then applied for and obtained a state-issued warrant to search the studio.

The officers thereafter returned to the studio and reentered the attic whereupon they seized two kilograms of cocaine, two loaded semi-automatic assault rifles and a loaded semi-automatic handgun. Additionally, the officers searched what they believed to be Goodman's desk and seized another handgun along with a JSO badge.

**B.    Arguments Presented by Goodman**

Goodman argues the "protective sweep" conducted by officers in the case effectively constituted a warrantless search of the studio. Goodman, further argues the items seized were obtained as the result of the warrantless and illegal search of his private business and therefore should be suppressed. In support, Goodman asserts the following. JSO officers arrived at the studio with a warrant for his arrest. Doc. No 446 at ¶ 2. The officers entered the studio without knocking or announcing their presence. Id. at ¶ 3. Once inside, the officers announced they were there to arrest Goodman. Id. at ¶ 4. Goodman, who at the time was situated in the threshold of the studio entrance, immediately identified himself to the officers. Id. at ¶ 5. Goodman along with approximately ten other individuals was then handcuffed as officers conducted a search of the entire premises. Id. at ¶ 6. As part of the hour-long search, officers entered the attic and opened a shoe box containing two kilograms of cocaine. Id. at ¶ 8, 9. The officers then obtained a search warrant to re-enter the studio and seize physical evidence. Id. at ¶ 10.

-3-

### C.    Arguments Presented by the Government

The Government argues the instant motion to suppress should be denied based upon the following.  First, the officers were lawfully entitled to execute the state-issued warrant for Goodman's arrest at the studio.  Second, in executing the arrest warrant, the officers were further entitled to conduct a protective sweep of the premises, including the unlocked attic, to ensure officer safety.  Third, Detective Bates properly obtained a valid warrant to search the studio as a result of the officers' plain view observations.  Alternatively, the Government contends the officers could have seized the packages of cocaine without a warrant because the items were discovered in plain view during execution of a valid arrest warrant.

## II.    Recommendations

Based upon the parties' written memoranda, the issues presented for the undersigned's review involve the validity of the protective sweep conducted in this case and the admissibility of the evidence subsequently seized.  As an initial matter, however, Goodman asserts that when the officers arrived at the studio to execute the warrant for his arrest, they entered the business in violation of his Fourth Amendment rights by failing to knock and announce their presence and purpose.  See Doc. 446 at ¶ 3.  Although Goodman fails to address the "knock and announce" issue in his memorandum in support of the instant motion, in an abundance of caution, the undersigned is nonetheless compelled to address whether the federal "knock and

-4-

announce" rule codified in 18. U.S.C. § 3109[2] is applicable to the facts presented in this case.

## A.   Federal "Knock and Announce" Rule

The United States Court of Appeals for the Eleventh Circuit has held "section 3109 applies only to a house and its curtilage, and does not apply to commercial buildings." United States v. Lopez, 898 F.2d 1505, 1511 (11th Cir. 1990).  Therefore, presumptively, Goodman argues in executing the arrest warrant, the officers were required to knock and announce their presence prior to entering his studio because it is a private establishment.[3]  In support, Goodman presented the testimony of Michael Nasworthy ("Nasworthy"), a former freelance engineer who worked at the studio, and Lawrence Leon Cash ("Cash"), co-owner of the studio.

Nasworthy testified the front doors of the studio were usually covered with posters or dark plastic to prevent glare inside the studio and to discourage people from

----

[2]The federal "knock and announce rule provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. § 3109.  Although expressed in terms of entry to execute a search warrant, 18 U.S.C. § 3109 also applies to entries to effect arrest, whether upon probable cause or pursuant to a warrant.  Sabbath v. United States, 391 U.S. 585, 588 (1968).

[3]Goodman bears the burden of establishing a prima facie case that a "knock and announce" violation has occurred under 18 U.S.C. § 3109, and overcoming the presumption of Government propriety.  United States v. Hromada, 49 F.3d 685, 689 (11th Cir. 1995).

-5-

looking into the studio. (Tr. 276:17- 278:2).[4]  Additionally, the front doors were

equipped with magnetic locks.  (Tr. 275:2-3). People were allowed to enter and exit the

studio via the magnetic lock release switch, which was located in the studio's front

office.  (Tr. 276:12-16).  Generally, the doors remained locked to secure expensive

equipment in the studio.  (Tr. 275:11-17).  Customers usually visited the studio by

invitation or appointment.  (Tr. 275:6-10).

When questioned whether the studio was public or private, on direct examination

Cash testified: "It was more of a private studio." (Tr. 312:2-6).  He further testified the

front doors were usually locked after hours and during private sessions with artists to

prevent outside interruptions.  (Tr. 313:1-3). On cross-examination, Cash testified that,

at the time officers arrived, there were no signs identifying the studio as private property

and the officers simply entered the studio's front doors because they were not locked.

(Tr. 315:15-20).

Based upon extensive review, the undersigned finds the evidence presented by

Goodman fails to conclusively establish that the studio was in fact a private

establishment rather than a commercial building open to the public.  The studio was

situated in a strip of commercial properties and its parking lot was openly accessible

from Lem Turner Boulevard. Although the front doors were equipped with magnetic

locks which were controlled by a release switch located in the front office; the doors

remained unlocked during normal business hours.  Indeed, the doors were unlocked

---

[4]Pending entry of the certified transcript of this proceeding, citations to the transcript in this Report and Recommendation refer to an unofficial copy of the transcript provided to the Court.

when the officers made entry into the business to execute the warrants in question.
Based upon the testimony of Nasworthy and Cash, it appears the magnetic locks were
used more for security purposes rather than preventing public access.  There was no
evidence presented indicating studio personnel utilized the magnetic release switch to
exclude others.  Additionally, although each testified that people entered the studio by
invitation or appointment only, no evidence was presented to suggest members of the
public were not free to simply enter the building in order to schedule appointments.
Accordingly, because, Goodman has failed to meet his burden in conclusively
demonstrating the studio was a private establishment, the federal "knock and
announce" rule provided under 18 U.S.C. § 3109 is inapplicable to the facts presented
in this case.

### B.    The Protective Sweep

In Maryland v. Buie, 494 U.S. 325 (1990), the Supreme Court defines a
"protective sweep" as a quick, limited search of the premises incident to an arrest and
conducted to protect the safety of police officers or others.  Buie, 494 U.S. at 327.  In
accordance with Buie, the search should be narrowly confined to a cursory visual
inspection of those places in which an individual might be hiding.   United States v.
Hromada, 49 F.3d 685 (11th Cir. 1995).  Furthermore, the protective sweep must last no
longer than it takes to complete the arrest and depart the premises.  Buie, 494 U.S. at
337.  Accordingly, the undersigned must determine whether the protective sweep
conducted in this case was reasonable under the facts presented.

The Government contends the officers were entitled to perform a protective sweep of the studio including the unlocked attic for the purpose of ensuring officer safety. In support, the Government presented the testimony of Officer Nixon and Detective Bates. In sum they testified as follows. As the officers approached the studio from Lem Turner Boulevard in an unmarked police car, they observed an unidentified individual standing in front of the studio. The individual noticed the officers approaching, then ran into the studio through a front door. The officers parked their vehicle in the studio parking lot, secured their tactical gear and entered the studio through the same front door.

Upon entering the studio, the officers announced their presence and encountered approximately 10 to 12 individuals in the immediate lobby area. It was later determined that one of the individuals was in fact Goodman. In an effort to secure the lobby area, the officers ordered the individuals to the floor and placed them in handcuffs. Believing that there were other individuals in the studio, once the lobby area was secured, the officers conducted a protective sweep of the entire premises. At least one individual was found hiding in a bathroom while at least two other individuals were found in back rooms.

Officer Nixon proceeded through a hallway adjacent to the studio entrance where he discovered an overhead unlatched attic door with an attached pull-down rope. Unaware of any other means of gaining access to the attic and based upon his belief that someone could possibly be hiding there, Officer Nixon opened the attic door and proceeded up the retractable staircase. Near the attic entrance in an opened shoe box,

Officer Nixon discovered what he believed to be cocaine wrapped in opaque packaging. He then informed Detective Bates of the package in the attic.  Detective Bates proceeded to the attic and observed the package.  After arresting Goodman pursuant to the warrant, Detective Bates applied for and obtained a state-issued warrant to search the studio.

Goodman contends that when the officers arrived at the studio to execute the arrest warrant, he was situated in the threshold of the studio entrance and immediately identified himself to the officers and, as such, the hour-long warrantless search of the studio, particularly the attic, exceeded the parameters of protective sweep exceptions dictated by law.  In support, he presented the testimony of Nasworthy and Cash as well as the testimony of Wayne Lee Downey, Jr. ("Downey"), a former in-house producer employed at the studio and James William Wright, an artist present during Goodman's arrest.

Nasworthy testified that, after returning from lunch, he entered the studio and briefly stopped in the lobby area.  There were several individuals in the lobby including Goodman.  While Nasworthy was in the lobby, an individual he identified as Kenny Mumford ("Mumford") entered the studio and mentioned police officers were approaching.  (Tr. 278:8-22).  Nasworthy further testified:

> I didn't think anything of it, to be honest with you.  Mr. Goodman had mentioned to me earlier that day that the police had been at his mom's house and were looking for somebody. [H]e mentioned it might have been his brother, about child support or something, so, you know, I really didn't think anything until it went crazy.

(Tr. 278:17-22). As the officers entered the studio, Nasworthy proceeded away from the lobby area, down a hallway and into the computer room. (Tr. 280:7-281:9). Upon entering the computer room, Nasworthy heard "some ruckus" and a "bunch of noise." (Tr. 277: 5-14). He also heard "get down" and recognized Goodman's voice identifying himself. Id. Nasworthy however did not return to the lobby. (Tr. 281:7-18).

In sum, Downey and Wright both testified just prior to the officers entering the studio, someone ran into the building and proceeded to the front office. (Tr. 286:17-287:2; 302:13-21). Without identifying themselves, the officers entered immediately thereafter with their weapons drawn ordering everyone in the lobby to get down on the floor. (Tr. 287:10-19; 300:17-18). Goodman immediately identified himself and advised the officers that he was aware they were looking for him. (Tr. 301:21-25).

Cash testified the officers entered the studio with their weapons drawn, ordered everyone to the floor then announced they were there to arrest Goodman. (Tr. 310: 21-25). At the time, Cash and two other individuals were in the front office. (Tr. 315:24-316:4). Goodman, who was sitting near the door, immediately identified himself. (Tr 310:25-311:4). Additionally, Cash testified immediately prior to the officers entering, an individual entered the lobby from outside the studio.

Here, defense witnesses consistently testified that Goodman immediately identified himself as officers entered the studio, and that the individuals in the lobby complied with the officers' orders to get on the floor thereby posing no threat to officer safety. The record however clearly establishes as they approached the studio to execute Goodman's arrest, an individual standing outside the business observed the

officers then ran inside the studio to warn others.  The record further establishes as officers entered the studio they encountered at least 10 individuals in the immediate lobby area and believed more individuals might be hiding in other rooms.  In fact, Nasworthy testified despite hearing the officers enter the lobby area, he continued down the hallway and entered the computer room.  Based upon such evidence, the undersigned finds the officers' suspicion of danger in executing Goodman's arrest was reasonable under the circumstances presented.  Additionally, officers faced with risks during an arrest are permitted to take reasonable steps to ensure their safety.  Buie, 494 U.S. at 334.  They have a legitimate interest in taking steps to assure themselves that the premises in which a suspect is being arrested is not harboring dangerous individuals who could unexpectedly launch an attack.  Id. at 333.  Therefore, even if the witnesses' testimony were accepted as fully credible, based upon additional evidence presented, the undersigned is not convinced the search at issue lasted longer than necessary to accurately identify Goodman, complete the arrest and depart the premises.

With respect to Officer Nixon's search of the attic, the undersigned rejects Goodman's contention that it extended beyond the bounds of a valid protective sweep. Consistent with Buie, the undersigned concludes that a protective sweep is appropriate in any room adjacent to the area of the arrest from which an attack could be immediately launched and in any location, including an attic, in which an attacker could hide.  Accordingly, based upon the evidence presented, particularly the layout of the studio and the number of people present inside, the undersigned further finds the

-11-

protective sweep in this case was conducted to secure the premises and investigate the officers' reasonable suspicion of danger.

### C.    Search of the Studio Incident to Goodman's Arrest

Based upon the undersigned's finding that the search conducted in the present case was valid, the next issue presented is whether the subsequent seizure of evidence was proper.  The Government contends Detective Bates properly obtained a valid warrant to search the studio as a result of the officers' plain view observations. Alternatively, the Government contends the officers could have seized the packages of cocaine without a warrant because the items were discovered in plain view during execution of a valid arrest warrant.  In his memorandum in support of the instant motion, Goodman counters by asserting officers opened the shoe box containing two kilograms of cocaine after illegally searching the attic; consequently, the search warrant for the studio was illegally obtained.   See Doc. No. 446.

In his affidavit for the warrant to search the studio, Detective Bates states: "Detective Nixon observed what appeared to be two kilograms of cocaine in plain view in a shoe box which was open."  A defendant who seeks to challenge the veracity of an affidavit in support of a search warrant must meet the threshold requirement of a "substantial preliminary showing" that false statements were deliberately or recklessly made.  Franks v. Delaware, 438 U.S. 154 (1978).  Additionally, the challenged statements must be necessary to a finding of probable cause.  United States v. Flagg, 919 F.2d 499 (8th Cir. 1990).  Therefore, before challenging the veracity of an affidavit submitted in request for a search warrant a defendant "must allege a falsehood or a

reckless disregard for the truth, and must accompany his allegations with an offer of proof.  Franks, 438 U.S. at 171.  Here, Goodman falls short of the "substantial preliminary showing" required by Franks in that he made no offer of proof by means of affidavits or otherwise.  He merely makes the bald conclusory assertion that officers opened the shoe box containing the cocaine after entering the attic.  Therefore, the undersigned finds no basis to invalidate the search warrant at issue.[5]

Accordingly, after due consideration, it is

**RECOMMENDED:**

The motion to suppress items seized filed by Defendant David Goodman (Doc. No. 446) be **DENIED.**

**DONE AND ORDERED** at Jacksonville, Florida this 3rd day of August, 2005.

**MONTE C. RICHARDSON**
United States Magistrate Judge

Copies to:

Counsel of Record
Any Unrepresented Party

---

[5]Based upon the foregoing it is not necessary to address the Government's alternative position.